In re PUBLIC SERVICE COMMISSION FOR FIRST DIST.

In re STEINWAY TUNNEL AND QUEENSBORO PLAZA ROUTE.

(Supreme Court, Appellate Division, Second Department. May 13, 1913.)

STREET RAILROADS (§ 10*)—PLAN FOR CONNECTING RAILROADS—COMMISSIONERS —REPORT—CONFIRMATION.

   The Queensboro Bridge has its terminal in a plaza formed by the approach to the bridge, and it was proposed to build a two-story station in such plaza to carry tracks on both levels to take care of the traffic. All the lines as shown in the plan were legalized, except one. On petition of the Public Service Commission for appointment of commissioners relative to the Steinway Tunnel and Queensboro Plaza route, objection was made that it was to be an elevated structure crossing Jackson street three times, when by building a subway from the terminal of the Steinway Tunnel it could proceed directly along Jackson street to the Plaza entrance; and it was also shown that it was possible to have all the tracks converging at the Plaza, some of which were necessarily elevated, meet by a descending grade at a subway station some place near the proposed station. *Held* that, not considering the increased cost of a subway, the plan as presented for an elevated structure would be approved, as whatever damage it would do could be compensated, and the subway would cause a readjustment of all the legalized lines.

   [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 15–19; Dec. Dig. § 10.*]

In the matter of the application of the Public Service Commission for the First District for the appointment of three commissioners, etc.; Steinway Tunnel and Queensboro Plaza Route. On motion to confirm report of commissioners. Granted.

See, also, 140 N. Y. Supp. 1141.

Argued before BURR, THOMAS, CARR, RICH, and STAPLETON, JJ.

George S. Coleman, Edward M. Bassett, and John B. Coleman, all of New York City, for the motion.

John Larkin, of New York City, opposed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

THOMAS, J.  The Queensboro Bridge ends in the Queensboro Plaza, which the convergence of traffic and trolley lines makes an important center in the borough of Queens. The Plaza, while acquired for the purpose of an approach to the bridge, actually serves for the civic uses of a free and open public place. It is proposed to occupy it entirely or in large part with a station having two stories; each carrying four tracks, the upper one devoted to trains from the west and bound for Astoria or Corona, and the lower story to trains from those points, and some. others later mentioned, and bound westward. One of the lines to be operated by the Brooklyn Rapid Transit Company, also operating in connection up and down Broadway, Manhattan, will cross Fifty-Ninth street to the Queensboro Bridge; thence over the lower level of the bridge to the Plaza; thence by a northerly elevated line to Astoria, and by a similarly easterly route to Woodside and Corona. The other line to be operated by the Interborough Company, operating as well in connection on Second avenue, Manhattan, will cross the bridge to Astoria and Corona. The returning trains will enter the Plaza station on the first story, and thence separate for the bridge; the Brooklyn Rapid Transit trains going on the lower level of the bridge, and the Interborough on the upper level. Through this station will also be operated trains by the Brooklyn Rapid Transit Company over its own line, so far as not constructed, to be built by it from Flatbush avenue, Brooklyn, to and over Newtown creek to Jackson avenue; thence in elevated form along that avenue to its appropriate track in the Plaza station; thence westward over the bridge. Jackson avenue will be used for this line, as its trains will go over the bridge, and not to Astoria or Corona, so it can enter the Plaza from the east; but lines going to Astoria and Corona enter the station from the west. All routes are determined and, save the crosstown or "Sea to Sound" line, legalized. But there is a track on each level of the proposed bridge station that will be appropriated to trains over a legalized route extending from Forty-Second street and Broadway, Times Square, through a tunnel to be built to connect with the present Steinway Tunnel, beginning at Forty-Second street and Lexington avenue, Manhattan, passing under the East river to and along Fourth street, Hunter's Point, where it will connect, near Van Alst street, with another route, called the "Steinway Tunnel and Queensboro Plaza Route," and known as No. 50, which now concerns us, and which, as proposed, will continue northeasterly as a subway some 600 feet, and then emerge and become an elevated line for 1,100 feet over the Sunnyside yard of the Long Island Railroad Company; thence bearing northerly through Davis street across Jackson avenue; thence northeasterly and following Ely avenue and entering from a westerly direction Queensboro Bridge Plaza, where its trains will find a track on the upper level of the proposed station and be dispatched either to Astoria or Corona, and returning from Astoria or Corona find a track on the lower level of the station. I also understand that some of its trains from the west will cross the bridge. So persons may travel from Forty-Second street, Times Square, and points intermediate it and the East river, to the Plaza, diverging thence as they will, or continuing to Astoria or Corona, or other points reached by any of the above lines.

The scheme of utilizing the Steinway Tunnel and making such connection between Manhattan and Queens, as well as the proposed connection with Brooklyn itself, excites only the approval it should. But the method of connecting the easterly end of the tunnel with the Plaza and the proposed station at the Plaza have induced much criticism and active opposition. The Interborough route from Forty-Second street, Times Square, through the tunnel, although at the time of hearing not legalized or connected with other lines, is a part of the general scheme, but is as a route legally dissociated from route No. 50, and the only purpose of the latter is to fill the gap from the tunnel terminal to the Plaza and there make connection. No. 50, a part of the Dual System, as a single route has no appreciable merit, and as a fragment is worthless. Even as a continuation of the terminal route, it will be of limited use to the territory through which it runs, as but one station between the tunnel and the Plaza has been considered; while its passage through the Long Island Railroad yards, where it will with its pillars share the occupation, dangers, and annoyance of the railroad plant, is a subject of adverse comment, and its very injurious presence for two or three blocks on Ely avenue fully justifies the complaint of property owners. Between its terminal the dwellers on the line as such will suffer much and gain little. And yet connection between the tunnel and the Plaza is demandable in the public interest, and if the only alternative is the tortuous route proposed the parties damaged must be content with compensation. Is there a practicable alternative? The objectors so state, and enforce their views with much apparent reason. They say that the route as it is connected with the tunnel and the Corona line crosses Jackson avenue three times, once at Fourth street, once at Davis street, and again at or near the Queens boulevard. So the inquiry is, Why is not the route laid from Fourth street along Jackson avenue straight to the Plaza entrance? The suggestion is fortified by the fact that the crosstown line will, as proposed, be built along Jackson avenue. The proposed line No. 50, some 5,800 feet long, and to the extent of 2,200 feet upon a curve is so hurtful to the territory traversed, and the Jackson avenue line from tunnel to Plaza, 4,975 feet in length, is so apparently adapted, that the underlying reason for not selecting it by those who had a high sense of duty and capacity to do it should be sought.

The proposed route (No. 50) for construction expenses alone will cost $750,000, aside from the damages that must be paid the Long Island Railroad Company and persons owning property on Ely avenue. I do not observe any sentiment on the part of the respondents favorable to an elevated road on Jackson avenue; but it is determined by the authorities and wished by some, who favor also route No. 50, that the crosstown line should follow that important avenue in an elevated form, although if a subway were built there and in the Plaza Mr. Craven would not favor the present line. He had, previous to the adoption of route No. 50, made no study of a subway on Jackson avenue with a terminal at the Plaza, and no plan for a subway to the Plaza on that avenue has been considered, and he and the authorities criticise the plan proposed by the respondents and adhere to the

route adopted. But the respondents insist that the subway on the avenue should be constructed, and that there was much evidence upon the subject of cost, although Mr. Willcox, so eminently related to the entire achievement, stated that in determining the present line the cost was not a determining factor. If a subway were placed in Jackson avenue, it would be expedient, if not necessary, to furnish tracks not only for this line, but also for the proposed crosstown line, and the evidence of the respondents is that such tracks would cost from $400 to $450 per lineal foot, although for a part of the way only one track would be needed, and the witness Bartlett places the total expense at $1,500,000, and at one place Mr. Craven stated that the expense would be three times the expense of the elevated, or about $2,250,000; and in another place it is stated that the cost would be $3,000,000. These figures do not cover the increased cost if water should be encountered seriously at the westerly end of the route; nor do they include the expense of a subway station at the Plaza, or of acquiring private property therefor, or for the purposes of making the connections with the Astoria and Corona line, as the respondents' plan suggests; nor, as I understand, does the $750,000, the cost of No. 50, include the expense of the elevated station at the Plaza. But the respondents estimate that the expense would not be greater than would be two elevated roads, one for the proposed line by way of Ely avenue and one for the crosstown elevated along Jackson avenue, which is part of the Dual System; and it is urged that the lift between the terminals would be decreased from 80 to 10 feet, with a lessened expense of operation and maintenance, and with some avoidance of dangers. But the petitioner gives evidence that nothing would be gained in the matter of lift, as the trains would enter the subway at the Plaza, and it would be equally expensive to raise them to meet the elevated routes; but Mr. Moran states a short lift is not as expensive as a continued rise along the whole line. This and other considerations (some of which are beyond solution with accuracy by this court) are used to show that the straight and shorter subway, practically without curve, is preferable to the winding and property-destroying elevated, and I think that no one will dispute the preference nor the desirability of the subway over the elevated at even some increased cost, if the plan were possible under existing conditions. While there are many and varied demands upon the city's credit, and economies must be observed when it would be the part of wisdom so to do, yet it would seem that striving for economy should not, in itself, demand that a subway route from Forty-Second street, Times Square, should, within less than a mile of its easterly terminal, change into what is proposed, when it could go straight to its mark on Jackson avenue in conjunction with the crosstown line. I may say that as I read the evidence there are no unusual engineering difficulties in constructing a subway under the avenue; nor is it merely a question of a reasonably increased outlay. The real difficulty is that a subway cannot be built providently under Jackson avenue without a subway station, in part at least, somewhat east of the proposed Plaza station and a readjustment of all the legalized routes that would run through it. I quote here, as showing ob-

jections to the proposed substituted plan, from Mr. Craven's testimony:

"Q. Now, I understand the summary of your statement * * * is, first, that the expense of putting in a subway at Jackson avenue would be increased from the fact that you·are under water to a certain extent? A. That would very largely increase the cost. Q. And the next point is that the city of New York has no money? A. I believe the city hasn't the money. * * * Q. I understand, in addition to the difficulties which you have mentioned, that there is a further or third difficulty, general difficulty, in that of making a connection with the elevated systems coming from the Queensborough Bridge with the proposed subway system coming up Jackson avenue? * * * A. I will state further that it cannot be made with the Corona line. Q. When you stated it could be made with the Corona line, I understand— A. I qualified that by saying as approved to-day—as legalized. Q. Exactly; in other words, if the elevated lines as projected or contemplated to-day stand upon the level contemplated to-day, they cannot make a convenient connection with the subway, except at Jackson avenue; is that right? A. Yes. Q. It is not a convenient thing or practical? A. You cannot make a connection at all with the Corona line. The Chairman: In your opinion it is impossible as well as impracticable? The Witness: Yes. Q. But if a proper engineering plan could be made to depress the elevated tracks coming off the bridge and the bridge plaza so as to meet with the subway, then that objection would be done away with, wouldn't it? A. I would like to say, to avoid answering all these questions, ifs and ands, that if we are to adopt an entirely new subway system and a new set of routes and plans I think we can find some way of doing it; but it will not be in accordance with the policy of the Commission, and that nothing that has been suggested will fit in with the routes as adopted."

At another place he says:

"I wish to state most positively now that I believe that that is the most desirable route for the purpose of connecting the Steinway Tunnel with the out-lying branches to Corona and Astoria, both from an economical point of view and from an operating point of view, most positively."

It may be said in this connection that Mr. Martin is quite as positive as Mr. Craven as to the excellence of route 50, and he condemns with possibly more vehemence a subway station at the Plaza, and his judgment is that, as the Plaza was acquired as an approach to the bridge, there is no reason for preserving it for a park. In brief, a subway on Jackson avenue cannot connect with the other elevated routes at the Plaza without raising the subway line or depressing the elevated line—a very plain proposition. Here, then, is the vital question: Should the court refuse consent to the proposed line because of the contemplated elevated construction in the Plaza and attempt to coerce the authorities to bring the bridge trains, the Astoria and Corona trains, and the Steinway Tunnel trains down into a subway station probably not in the Plaza, but somewhat easterly of it? After careful reading of the evidence it is clear that Mr. Craven, the engineer for the Subway Commission, could route all the trains from and to the bridge, and other directions, through a subsurface station, if not at, at least so near, the Plaza as to accommodate the people centering at that point. Mr. Moran, whose capacity as an expert was conceded, unqualifiedly stated that it could be done in several ways indicated by him. In short, the suggestion was to bring the elevated lines on the bridge down on a 5 per cent. grade (the grade at the westerly end of

the bridge is 5.2 per cent.), closing Prospect and possibly slightly disturbing Radde street, to a subway station in the Plaza or just east of it, with tracks ascending again to gain beyond the Plaza the Astoria and Corona lines, using some private property for the purpose. In that way the Plaza would be saved from occupation for an elevated station, with its rows of pillars incumbering and its superstructure obscuring the street. It is not an answer to say that the plan of Mr. New (S. A. I.) is absurd, or to insist that the envelopment of a public place by a roofed elevated structure is more to its advantage. The Plaza will become, it is justly apprehended, what all similarly incumbered places are, necessary centers for travel and beneficent for their environment, but in themselves uninviting. Mr. Craven admits that the plan suggested by Mr. New, or something corresponding in purpose, could be done, and no one studying his proposed elevated station could doubt his ability to effect the result by a subway station. But he is struggling with the incubus of cost, and beyond that with the apparent fixity of conditions. The bridge is for elevated trains; the Astoria and Corona routes are elevated, and must be. They are legalized and also under contract, and it is observed that he views with hostility a plan that would change what is so essentially established, and what without further halting should be under way. 'The question that presents itself to this court' is whether it should refuse the proposed line if it be proven that Jackson avenue, appropriated for an elevated, could be used for a subway accommodating this and the crosstown line with a subway station at the Plaza, to which the elevated tracks could be brought. Mr. New has clearly, but not with much finality of detail, shown a plan for such subway station on his drawing S. A. I., which, with some criticism and suggested change, Mr. Moran and others approve. As already stated, Mr. Moran gives his views and makes independent suggestions, and shows how the modification of present plans could be made. If this court refuses its consent, the station will be built and all the lines routed through it, save the one under consideration. The Steinway Tunnel will have its present apparently useless terminal, and the people of Queens will have little or no beneficial access to it, unless the authorities should make a complete rearrangement at the Plaza. It is not the function of this court to compel so much to be done; it has no power to do so, and if the line as proposed be rejected there is no assurance that there will be any substituted plan similar to that suggested by respondents. The connection, whatever its faults, is better than none, and does no harm to property owners that cannot be compensated, and as a connecting link it should convenience the people and enhance the prosperity of the borough of Queens at large. The people of the borough of Queens may gravely consider, if they will, the question of preserving the Plaza and Jackson avenue from an elevated structure. Before the tunnel or bridge can be used for proposed connections, the former must be extended to Times Square and others adapted, and the bridge strengthened at an expense of about $2,500,000, and the time required for this preliminary work will be from 1½ to 2 years, and there is ample time to make any necessary readjustment, and as much of the detail for the

station has not been worked out there is opportunity for such reconsideration as wisdom may suggest. But all that is not a question for this court to determine.

The report must be confirmed and the petition granted, without costs. All concur.